UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Lyon Financial Services, Inc.,
d/b/a USBancorp Business Equipment
Finance Group,

      Plaintiff,

Civ. No. 08-5498 (RHK/JSM)
**MEMORANDUM OPINION
AND ORDER**

v.

Oxford Maxillofacial Surgery, Inc.,
and Scott D. Whitaker,

      Defendants.
_____

Kevin K. Stroup, Stoneberg, Giles & Stroup, PA, Marshall, Minnesota, for Plaintiff.

Adam A. Gillette, Fruth, Jamison & Elsass, Minneapolis, Minnesota, for Defendants.
_____

## INTRODUCTION

Plaintiff, Lyon Financial Services, Inc. ("Lyon") asserts that Defendants Oxford Maxillofacial Surgery, Inc. ("Oxford") and Dr. Scott D. Whitaker breached the parties' finance lease and guarantee agreement by failing to make payments. Currently pending before the Court is Lyon's Motion for Summary Judgment. For the reasons set forth below, the Court will grant the Motion in part and deny it in part.

## BACKGROUND

Dr. Whitaker is an oral and maxillofacial surgeon and the owner and president of Oxford, a facial surgery practice located in Oxford, Mississippi. (Whitaker Aff. ¶ 2.) In

March 2006, a representative of PSS World Medical, Inc. ("PSS"), Don Davis, contacted Dr. Whitaker to discuss the Cutera Laser (the "Laser"), a new product for cosmetic skin procedures. (Id. ¶¶ 3-4.) Davis discussed the Laser with Dr. Whitaker, asserting that physicians who purchased it were generating significant revenues. (Id. ¶ 4.)

Davis then introduced Dr. Whitaker to Michael Poole, a representative of Cutera World Headquarters. (Id. ¶ 5.) Poole demonstrated the Laser's capabilities to Dr. Whitaker and informed him that the Laser was generating $20,000 per month in revenues for medical practices in small rural areas. (Id. ¶ 6.) He also represented that Dr. Whitaker would be the only physician that owned the Laser in Northern Mississippi. (Id. ¶ 7.) These representations regarding expected revenues and an exclusive sales territory convinced Dr. Whitaker to purchase the Laser at a cost of $195,000. (Id. ¶ 8; Adam A. Gillette Aff. Ex. 8.)

Davis offered to assist Dr. Whitaker in securing financing for the Laser and provided him with Lyon's E-Z Lease Agreement (the "Lease"). (Whitaker Aff. ¶ 9.) Dr. Whitaker executed the Lease on behalf of Oxford and also signed a personal guarantee. (Gillette Aff. Ex. 1.) The Lease provides that upon Oxford's receipt and acceptance of the Laser, its terms become "irrevocable and unconditional in all respects." (Id.) Dr. Whitaker's guarantee provides that he personally and unconditionally guarantees the Lease and all of its obligations. (Id.) Lyon paid PSS a commission of $14,625 for selling the Lease. (Id. Ex. 9.)

Oxford accepted delivery of the Laser and Dr. Whitaker signed a Certificate of

Acceptance on its behalf. (Brenda Denelsbeck Aff. Ex. B.) The certificate acknowledges that all terms of the Lease are in "full force and effect." (Id.) It also provides that Oxford accepted the Laser "in accordance with all the terms and conditions of the lease, and agrees that Lessor has fully and satisfactorily performed all covenants to be performed by Lessor pursuant to the Lease." (Id.)

Dr. Whitaker spent a significant amount of money marketing the Laser. (Whitaker Aff. ¶ 11.) However, the Laser did not produce the predicted revenues, generating only $15,000 from August 2006 to July 2008. (Id. ¶ 12.) Oxford and Dr. Whitaker assert that these disappointing sales are attributable in part to the sale of a Cutera Laser to a dermatology practice located approximately one mile from Oxford. (Id. ¶ 13.)

Oxford began to experience financial troubles in 2008. (Id. ¶ 14.) In response, Lyon offered lowered Lease payments for three months, but such relief proved insufficient. (Id.) Lyon then offered to repossess and resell the Laser and Oxford agreed to the proposal. (Id.)

After repossession, Lyon solicited bids on the Laser. (Gillette Aff. Exs. 4, 6, 7, 10, 11.) The highest bid of $12,000 was accepted. (Gillette Aff. Exs. 10-11.) Lyon then filed the instant action to enforce its rights under the Lease and now moves for summary judgment, requesting full payment on the Lease (less the $12,000 recovered from the resale), interest, costs, disbursements, and attorneys' fees.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the

3

nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

The Lease in this case is properly categorized as a "finance lease,"[1] which is "a separate contract, creating direct rights." Lyon Fin. Servs., Inc. v. Protech Plumbing & Heating, Inc., No. A03-810, 2004 WL 376966, at *4 (Minn. Ct. App. Mar. 2, 2004).[2]

---

[1] Oxford does not contest that the Lease in this case is a finance lease. A finance lease is "a lease in which (1) the lessor does not select, manufacture, or supply the goods, (2) the lessor acquires the goods or the right to possession and use of the goods in connection with the lease, and (3) either (i) the lessee receives a copy of the contract evidencing the lessor's purchase of the goods or a disclaimer statement on or before signing the lease contract, or (ii) the lessee's approval of the contract evidencing the lessor's purchase of the goods or a disclaimer statement is a condition to effectiveness of the lease contract." Minn. Stat. § 336.2A-103(1)(g).

[2] The Court applies Minnesota law in interpreting the Lease in accordance with its choice-of-law

Such leases often contain what is commonly referred to as a "hell or high water" clause, which makes payment obligations irrevocable and unconditional once leased goods are accepted. Id. at *3. Such clauses require lease payments to be made "no matter what." Leasetec Corp. v. Orient Sys., Inc., 85 F. Supp. 2d 1310, 1316 (S.D. Fla. 1999). Courts generally enforce such clauses in nonconsumer financial leases. Protech, 2004 WL 376966, at *3.[3] In this case, the Lease has a "hell or high water" clause and Dr. Whitaker's guarantee makes him personally and unconditionally liable for all payments required under the Lease. (Gillette Aff. Ex. 1.)

Oxford does not deny that it has breached the Lease through its failure to make payments and Dr. Whitaker does not deny the breach of his personal guarantee. However, Oxford and Dr. Whitaker do contend that summary judgment is inappropriate because there is a genuine issue of material fact regarding two affirmative defenses: estoppel and failure to mitigate damages: The Court will address each defense below.

**I.      Estoppel**

Oxford and Dr. Whitaker assert the affirmative defense of estoppel. (Mem. in Opp'n at 9-11.) Estoppel "is intended to prevent a party from taking unconscionable advantage of his own writing by asserting his strict legal rights." N. Petrochemical Co. v. U.S. Fire Ins. Co., 277 N.W.2d 408, 410 (Minn. 1979). The following are the elements of estoppel:

---

provision. (Gillette Aff. Ex. 1.)

> 1. There must be conduct [sic] acts, language or silence amounting to a representation or a concealment of material facts. 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. 3. The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, and at the time when it was acted upon by him. 4. The conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. 5. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. 6. He must in fact act upon it in such a manner as to change his position for the worse, in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it.

Lunning v. Land O' Lakes, 303 N.W.2d 452, 457 (Minn. 1980). The Court need not address each of these elements as Oxford and Dr. Whitaker cannot establish the first element: a representation or concealment by Lyon.

Oxford and Dr. Whitaker contend that "Lyon's representatives engaged in conduct amounting to a representation or a concealment of material facts." (Mem. in Opp'n at 10.) Specifically, they contend that Davis and Poole acted as Lyon's agents in procuring the Lease and therefore, all misrepresentations made by them regarding expected revenues and an exclusive sales territory can be imputed to Lyon. The Court does not agree.

Generally, "fraud and misrepresentation by an equipment vendor" do not preclude "enforcement of a financial lease." Lyon Fin. Servs., Inc. v. Hearyman, No. A08-1795, 2009 WL 1515598, at *3 (Minn. Ct. App. June 2, 2009). Defendants cite no law

---

[3] Oxford does not assert that the subject Lease is a consumer lease.

supporting the contention that Davis and Poole were Lyon's agents. Under Minnesota law, an agency relationship results if:

> [T]here is an understanding between the parties which, as interpreted by the court, creates a fiduciary relation in which the fiduciary is subject to the directions of the one on whose account he acts. It is the element of continuous subjection to the will of the principal which distinguishes the agent from other fiduciaries.

Jurek v. Thompson, 241 N.W.2d 788, 791 (Minn. 1976). Thus, "[i]n the absence of any persuasive evidence of manifestation of consent, right of control, and fiduciary relationship, there is no agency as a matter of law." Id. at 793.[4]

In this case, there is no evidence demonstrating Lyon's right to control Davis or Poole. For example, there is no evidence that Davis or Poole were required to recommend Lyon's leasing services nor is there any evidence that Lyon controlled their sales practices.[5] Moreover, there is no evidence that Davis or Poole stated that they were Lyon's agents. The fact that Davis assisted Dr. Whitaker in obtaining financing does not establish agency. See Agristor Leasing v. Hansen, Civ. No. 4-84-632, 1985 WL 6073, at *8 (D. Minn. Feb. 13, 1985) (MacLaughlin, J.) (holding that under Minnesota law, the

---

[4] Counsel for Oxford and Dr. Whitaker asserted during oral argument that the Lease and Dr. Whitaker's personal guarantee are two separate contracts, and therefore, warranty disclaimers in the Lease do not affect Dr. Whitaker's rights under his personal guarantee. However, this argument is of no relevance to Dr. Whitaker's estoppel defense because Davis and Poole were not Lyon's agents as a matter of law.

[5] Oxford and Dr. Whitaker note that Davis was paid a commission for obtaining the Lease (Mem. in Opp'n at 10), but the simple payment of a commission does not indicate control. For example, a paid independent contractor may or may not be the agent of the entity that employs him depending on the degree of control asserted by the entity. Musse v. Engle, No. A07-0725, 2008 WL 2020444, at *5 (Minn. Ct. App. May 13, 2008).

fact that "sales personnel bring up the idea of [a lease] during the sales negotiation, explain the lease to customers, and assist in the completing of the lease application" is not enough to demonstrate an agency relationship between a sales agent and a lessor).

The above analysis demonstrates that Oxford and Dr. Whitaker cannot establish estoppel as a matter of law. Absent this defense, Oxford and Dr. Whitaker do not dispute that the "hell or high water" clause is enforceable. Therefore, summary judgment is appropriate and will be granted on the issue of liability.

## II. Failure to mitigate damages

Oxford and Dr. Whitaker assert that even if they are liable under the Lease and personal guarantee, summary judgment cannot be granted as to Lyon's damages because "[f]act questions exist as to whether Lyon has reasonably attempted to mitigate its damages." (Mem. in Opp'n at 7.) Specifically, they assert that the Laser was sold for $12,000, 6% of the original price of $195,000. In making this argument, they direct the Court to two websites offering the Cutera Laser for sale prices of $75,000 and $130,000. (Gillette Aff. Exs. 13, 14.)

Under Minnesota law, the injured party upon a breach of contract has the duty to use reasonable diligence in mitigating damages. Deutz-Allis Credit Corp. v. Jensen, 458 N.W.2d 163, 166 (Minn. Ct. App. 1990).[6] However, what constitutes reasonable

---

[6] Lyon argued during oral argument that it did not have a duty to mitigate its damages. The Court does not agree. Minnesota law requires the reasonable mitigation of damages. Deutz-Allis, 458 N.W.2d at 166. No provision in the Lease waives Lyon's mitigation duty and Lyon

8

diligence "will depend on the facts of the particular case." Id. While the Uniform Commercial Code's concept of "commercial reasonableness" in a secured transaction is not directly applicable in this case, Minnesota courts find it "helpful in determining mitigation of damages issues" when leased property is repossessed and resold. Id. Accordingly, for the resale of the Laser to constitute a reasonably diligent mitigation effort, "[e]very aspect of the disposition, . . . including the method, manner, time, place, and other terms," must be commercially reasonable. Minn. Stat. § 336.9-610. Generally, commercial reasonableness is a question of fact. Ford Motor Credit Co. v. Russell, 519 N.W.2d 460, 465 (Minn. Ct. App. 1994). The burden is on the non-breaching party to demonstrate the reasonable mitigation of damages. Elk River Ford, Inc. v. Hoecherl, 428 N.W.2d 857, 859 (Minn. Ct. App. 1988).

There is a genuine issue of material fact as to whether Lyon reasonably mitigated its damages. Pursuant to its policies, Lyon offered the Laser for sale to the highest bidder. (Denelsbeck Second Aff. Exs. K-N.) Prior to the offering, Lyon wrote a letter to Oxford stating that the Laser would be sold by private sale. (Id. Ex. O.) This letter also stated that if Oxford was aware of another business that may be interested in the Laser, or if it had any other suggestions that might help Lyon in obtaining the maximum sale price, such information should be communicated to Lyon. (Id.) Oxford did not respond.

Despite these efforts, Lyon has not provided the Court with sufficient evidence to

---

cites no supporting authority for the proposition that finance lessors do not have a duty to mitigate damages under Article 2A of the UCC.

establish its commercial reasonableness as a matter of law. A disposition is considered to be commercially reasonable:

> [i]f the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold.

Karlstad State Bank v. Fritsche, 374 N.W.2d 177, 182 (Minn. Ct. App. 1985). Lyon did not sell the Laser in a "recognized market" because a "recognized market" is one where "prices are not subject to individual negotiation." Minn. Stat. § 336.9-610 cmt. 9. Moreover, Lyon has not provided the Court with information indicating that $12,000 was the current market price at the time of sale. Finally, Lyon has provided no information indicating that the private sale of the Laser was "in conformity with reasonable commercial practices among dealers" of medical equipment. Karlstad, 374 N.W.2d at 182. The Court cannot conclude that Lyon's sale was commercially reasonable given this lack of information.

The Laser was sold for 6% of its original value and similar Cutera Lasers have been offered for sale at significantly higher prices. "[A] low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable." Minn. Stat. § 336.9-610 cmt. 10. That Lyon followed its usual resale practices does not, in and of itself, render the sale commercially reasonable. Moreover, the fact that Lyon requested resale assistance from Oxford and Dr. Whitaker does not dissolve its duty to reasonably mitigate its damages. Accordingly, a genuine

issue of material fact remains as to Lyon's damages in this case.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Lyon's Motion for Summary Judgment (Doc. No. 14) is **GRANTED** as to liability and **DENIED** as to damages.[7]


Dated: July 17, 2009                                s/Richard H. Kyle
                                                    RICHARD H. KYLE
                                                    United States District Judge

---

[7] This matter is on the Court's civil trial calendar for October 1, 2009; the only issue remaining for trial is the amount of damages, if any, to which Lyon is entitled.